IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRUCE LUCENTA, )<br>)<br>)<br>        Plaintiff,    )<br>)<br>            v.          )        No. 02-CV-955-JHP-SAJ<br>)<br>FORTIS INSURANCE COMPANY, )<br>)<br>)<br>        Defendant. ) | |

## ORDER

Defendant, Fortis Insurance Company ("Fortis"), moves for judgment on behalf of itself affirming its decision to deny Plaintiff's claim for benefits. Fortis denied Plaintiff benefits under a policy of group health insurance issued by Fortis to Royaltone Company, Inc. ("Royaltone") as part of an employee welfare benefit plan (the "Plan") established by Royaltone. Plaintiff's claim is for approximately $55,000 in unpaid medical bills which he claims were payable under the Plan. The parties agree the Plan is subject to and governed by the Employee Retirement Income Security Act, 29 U.S.C. §§1101 et seq. ("ERISA").

29 U.S.C. §1132(a)(1)(B) governs Plaintiff's claims for benefits, and the claim is treated as an appeal. *See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 62-63 (1987).* Specifically, the court is conducting an administrative review, much like cases under the Administrative Procedures Act. *See e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)(requiring district courts to apply appellate standard of review to Plan's decision); Sandoval v. Aetna Life & Casualty Ins. Co., 967 F.2d 377 (10th Cir. 1992)(requiring district courts to confine their review to the "administrative record" consisting of the arguments and authorities submitted to or considered by the plan's decision maker at the time of its decision).* Jury trials are improper. *Adams v. Cyprus Amax Mineral Co., 149 F.3d 1156, 1160 (10th Cir. 1998).*

In reviewing Fortis's decision denying Plaintiff's claim for benefits, the court must apply an

appellate standard of review (arbitrary or capricious, or de novo). *See Bruch, 489 U.S. at 115.* Under ERISA, "a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, or to construe the terms of the plan." *See Id.; accord Ray v. UNUM Life Insurance Co., 314 F.3d 482, 485-86 (10th Cir. 2002); Nance v. Sun Life Assurance Co., 294 F.3d 1263, 1266 (10th Cir. 2002); Hall v. UNUM Life Insurance Co., 300 F.3d 1197 (10th Cir. 2002); Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998); Sandoval, 967 F.2d at 378.* In the instant case, the Plan provides that Fortis has the sole discretion to determine the eligibility for benefits and to provide the final decision as to the validity of a claim. Accordingly, the arbitrary and capricious standard governs this court's review of Fortis's denial of benefits to Plaintiff. Further, the parties agree the decision in the instant case is controlled by the arbitrary and capricious standard of review. (Agreed Pretrial Order at 2).

Under the arbitrary and capricious standard of review, there must be "[s]ubstantial evidence . . . that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker. Substantial evidence requires more than a scintilla but less than a preponderance." *Sandoval, 967 F.2d at 382.* Thus, Fortis's decision –

> need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious . . . The decision will be upheld unless it is not grounded on any reasonable basis . . . The reviewing court need only assure that [its] decision falls somewhere on the continuum of reasonableness- even if on the low end.

*Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999).*

Another ERISA principle applicable to the claim for benefits is that judicial review of Fortis's final decision must be confined to the "administrative record" consisting of the arguments and evidence that were submitted to, or considered by, Fortis at the time of its decision. *See Nance v. Sun Life Assurance Co., 294 F.3d 1263, 1269 (10th Cir. 2002); Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999); Chambers v. Family Health Plan Corp., 100 F.3d 818 (10th Cir. 1996); Sandoval, 967 F.2d at 380.* Thus, evidence outside the record, including extraneous exhibits,

depositions, and trial testimony cannot be considered by the court.[1]

It is Plaintiff's responsibility to produce evidence to the employer. In *Sandoval, 967 F.2d at 380*, the Tenth Circuit held:

> If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence. [The participant] is not entitled a second chance to prove his disability.

*967 F.2d at 381*. ERISA and Tenth Circuit precedent require Plaintiff to submit all evidence which he or she considered to be relevant during the claims process, or during the internal appeal process. *See Id*. When that process is complete, a "curtain falls" on the material that can be considered by the court. *See Id*. There is one caveat, however, which was recognized by the Tenth Circuit Court of Appeals in *Gaither v. Aetna, 388 F.3d 759 (Okla. 2004)*. In *Gaither*, the insured plaintiff was suspended from his job for his use of narcotic pain medication, which his employer determined rendered him unfit to work at his job. *Gaither, 388 F.3d at 761-65*. The defendant ERISA insurer, however, denied disability benefits on the basis that the underlying conditions that caused the insured to need disability benefits did not render him disabled. *Id. at 765-66*. The insurer was unaware that the insured had been suspended from his job for his use of narcotic pain medication. *Id. at 761, 766*.

The Tenth Circuit began its analysis by noting that while the administrative record did not contain the information the insured had been suspended from his job for use of narcotic pain medication, the administrative record did discuss the insured's previous use of pain medication, and that being drug-free was an essential requirement of his job. *Id. at 768-70*. Based upon this review of the administrative record, the *Gatiher* court explained that

> while the administrative record may not have contained conclusive proof of ongoing narcotic drug use, [the insurer] had more than enough evidence to alert it to the possibility that during the relevant time period, the [insured] was using narcotic pain medication; that he had a medical justification for doing so ...; and that any such drug use rendered him unfit for his job...

---

[1] There are many other non-traditional principles that apply in these cases. *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987)(state law claims, theories and requests for relief are preempted)*; there is no jury trial, Adams v. Cyprus Amax Mineral Co., 149 F.3d 1156, 1160 (10th Cir. 1998); Lafoy v. HMO Colo., 988 F.2d 97 (10th Cir. 1993)(only equitable remedies are permitted); Straub v. Western Union Tel.Co., 851 F.2d 1262, 1265-66 (10th Cir. 1988)(the written terms of the plan govern).

*Id.* at 770. The *Gaither* court found that

> Given the indications in the record of a drug problem ... it was arbitrary and capricious for [the insurer] to dismiss the [insured's] claim for disability without at least attempting to obtain information from [the employer] about the reasons for [the insured's] leave of absence .. . [W]hile [the insurer's] physicians had substantial evidence supporting their conclusion that [the insured] was not psychologically disabled, they did not have substantial evidence about the extent or effects of his uncontroverted use of painkillers, another independent ground for disability . . .

*Id.* at 773. In response to the insurer's argument that this case would result in insurers having to engage in an extensive search for information not provided by the insured, the Tenth Circuit explained that, "we assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement, and when they have little or no evidence in the record to refute that theory." *Id.* at 773. "The *Gaither* case lays to rest [an insurer's] position that it is Plaintiff's job to provide all supporting evidence to [the insurer].*" Omasta v. The Choices Benefit Plan,* 352 F. Supp.2d 1201, 1211 (Utah 2004).

Therefore, under the arbitrary and capricious standard, this court must uphold Defendant's decision so long as it is supported by "substantial evidence." *Sandavol, 967 F.2d at 382.* The court may only reverse Defendant's decision if the decision was not grounded on "any reasonable basis. " *Kimber, 196 F.3d at 1098.* The court must also search the administrative record for evidence supporting an independent ground for disability other than, or secondary to, the one asserted by Plaintiff, and which could have been substantiated if the insurer had obtained additional evidence. *Gaither, 388 F.3d at 774*.

The record reveals effective September 1, 1994, Fortis issued Group Policy No. 345018 to Royaltone as part of the Plan for which Royaltone was both sponsor and administrator. Plaintiff's enrollment in the Plan became effective on September 1, 1994 (Agreed Pretrial Order at 1). The Plan specifically excluded coverage for services relating to weight reduction, including surgery relating to obesity, as well as treatment of complications of excluded services or treatments (Record, Vol. VI at 02320). The Plan provides benefits for pre-existing conditions after the covered person has been continuously insured under the policy for twelve (12) months (Record, Vol. VI at 02322). The Plan

reserves the right to have "a physician of our choice examine a covered person as often as necessary while a claim is pending ..." (Record, Vol. VI, at 02329). Fortis never invoked this right, nor requested additional objective medical testing.

On April 24, 2000, Plaintiff underwent stomach banding surgery due to severe obesity (Record, Vol. I at 00191). No claims for reimbursement were submitted to Fortis for the surgery, services, or hospitalization associated with the surgery. Plaintiff agrees this was a non-covered event due to its exclusion under the Plan, and Plaintiff paid for this himself. Over the next eighteen (18) months, Plaintiff claims he suffered from other severe medical problems, which were completely unrelated to the stomach banding procedure, and which resolved completely after subsequent removal of his diseased gall bladder. Fortis denied Plaintiff benefits on the grounds that the claims he submitted were for treatment related to the stomach banding surgery.

The court finds Defendant's decision to deny benefits was unreasonable and unsupported by substantial evidence. Dr. David Traub, M.D., the Plaintiff's primary care physician, began treating Plaintiff with the drug Prevacid on September 21, 1999, due to Plaintiff's complaints of upper gastrointestinal pain. These complaints predated the Plaintiff's elective surgery by ten (10) months. Plaintiff states this drug is a commonly prescribed medication for ulcers and/or esophagitis conditions/complaints. The prescription was filled approximately six (6) weeks prior to the Plaintiff's banding surgery. Fortis paid for this medication, office visits relative to x-rays, and lab work prior to the 2000 surgery (Record, Vol. III at 00948, 00956, 00958, 00978 and Vol. VII at 2461-62).

Subsequent to the banding surgery, Plaintiff began experiencing extreme nausea, vomiting and dehydration. He returned to his primary care physician, Dr. Traub, on May 11, 2000. At the request of Dr. Traub, Plaintiff underwent numerous diagnostic tests to determine the origin of his physical complaints. Dr. Traub ordered tests and began IV fluid replenishment. He continued this extensive therapy, and initially felt the Gortex band was too tight to allow passage of fluids.

On May 17, 2000, three weeks post surgery, Dr. Richard Siefert, M.D. performed a scope of Plaintiff's esophagus, stomach and duodenum at Hillcrest Hospital (Record, Vol. VII at 2454). This objective diagnostic test revealed the presence of severe esophagitis, hiatel hernia, and ulcer disease. Plaintiff contends this diagnosis is consistent with the need for Prevacid previously prescribed, and that these conditions take much longer to manifest than three weeks post-surgery. Notably, the study indicates the surgeon was able to pass the scope through the opening, negating the earlier presumption that gastric outlet obstruction was present.

Subsequent to these findings, Plaintiff's medical condition continued to deteriorate. Since Fortis had denied all claims and medical requests for treatment, Dr. Traub continued to provide Plaintiff with medical care in his office, as hospital admission was not an option. (Record, Vo. VII at 2450-54). Dr. Traub wrote Fortis on four separate occasions explaining that the Plaintiff's physical complaints were not related to his stomach banding, and that Plaintiff's physical condition was grave (Record, Vo. VII at 2450-54).

On December 1, 2000, Dr. Peter Aran, M.D., performed an EGD study at Dr. Traub's request. Again, confirmation was obtained that no gastric outlet obstruction was present, and no critical stricture was seen in the proximal stomach (Record, Vol. VII at 2456).

Also on December 1, 2000, Dr. Gregory Williams, M.D., performed pathological studies on the biopsies taken by Dr. Aran. He concluded that Plaintiff had chronic inflamation in the stomach and chronic inflamation of the esophagus. Dr. Aran's diagnostic studies revealed "some narrowing of the postbulbar portion of the duodenal C-loop, probably from peptic ulcer scarring," and esophagitis (Record, Vol. VII at 2455).

On April 25, 2001, a barium swallow test was ordered by Dr. Traub to be performed on Plaintiff at St. Francis Hospital. The test reports indicated that the dye easily passed through Plaintiff's stomach. The radiologist determined Plaintiff had severe esophagitis, and no stomach obstruction (Record, Vol. VII at 2457).

Finally, Dr. Traub suspected gallbladder dysfunction and ordered a hidascan. The results indicated Plaintiff's gallbladder had multiple stones, wall thickening, and proved he had chronic gall bladder disease. Plaintiff presented to St. Anthony Hospital in Oklahoma City, Oklahoma, on December 11, 2001, and his gall bladder was removed. Plaintiff has not required medical attention for his disputed physical complaints since that date (Record, Vol. VII at 2460).

Fortis denied Plaintiff's claims based on Dr. Richard Seifert's history and initial impressions. Initially, Dr. Seifert contemplated the Plaintiff's inability to eat was due to his recent gastric stapling, however, his May 17, 2000, diagnostic scope study clearly revealed the presence of severe esophagitis, hiatal hernia, and severe ulcer disease (Record, Vol. VII at 2454). The initial discharge summary prepared by Dr. Siefert dated May 23, 2000, states the diagnosis as :

1. Dehydration
2. Inability to eat secondary to recent gastric stapling surgery
3. Severe esophagitis

>     **4. Elevated liver enzymes**

(emphasis added).

The Plaintiff was discharged without further testing, and no determination was made to discover the basis for the elevated liver enzymes at that time. Subsequent studies were ordered to determine the etiology, which revealed Plaintiff had cholecystitus - (an inflamed gall bladder) (Record, Vol. VII at 2453, 2460).

Fortis contends that its medical director's review included all of the medical records of Dr. Siefert, Hillcrest Hospital and Dr. Traub. In Fortis's continual denial of benefits, Fortis relied on Dr. Charolette Heindenreich who found:

> . . . There is no record provided that indicates whether ulcer disease or other condition was present prior to the revision procedure.

(Record, Vol. I at 00333, 00335-00342).

This assertion is incorrect. Plaintiff was treated with Prevacid prior to his gastric surgery by his primary care physician. Evidence of this medication, authorization, and subsequent re-filling by Fortis, predated the Plaintiff's surgery by ten (10) months (Record, Vol. VII at 2461-62). Fortis paid for these medications, and had notice of Plaintiff's symptoms before Plaintiff's gastric banding.

Dr. Heindenreich further stated that:

> There is no gastric ulcer at this time that is producing the symptoms, **presumably** the ongoing nausea and resulting dehydration are a result of the bariatric surgery.

(emphasis added).

Plaintiff argues Dr. Heindenreich failed to determine the correlation between nausea, vomiting and resulting dehydration, with the ulcer and gall bladder disease. Dr. Heindreich also failed to relate the nausea and vomiting to an inflamed gall bladder with cholecystitis, in the face of positive test results, as well as the on-going Prevacid medications Plaintiff was taking.

Additionally, Dr. Heindenreich reviewed the pathological studies on biopsies taken by Dr. Pete Aran and attributed the chronic inflamation in the Plaintiff's stomach and esophagus to the "bariatric surgery." (Record, Vol. I at 00333, 00335-00342). She found the medical records failed "to support the assertion made by Dr. Traub in his letter of appeal dated Jan. 22, 2002, "that Plaintiff had esophagitis. In fact, Dr. Traub's January 11, 2002, letter to Fortis not only advises them of the Plaintiff's

gastroesophageal reflux, but points out Plaintiff's recent diagnosis of cholecystitis (Record, Vol. VII at 2453).

On April 25, 2001, a barium swallow test was ordered by Dr. Traub. The test report indicated the dye easily passed through the Plaintiff's stomach. The radiologist determined the Plaintiff had severe esophogitis, not gastric outlet obstruction (Record, Vol. VII at 2457). On June 17, 2001, the Plaintiff was admitted to Southcrest Hospital for abdominal pain. The Plaintiff underwent a surgical procedure to lyse the adhesional bands that had formed on his intestines, freeing the blood supply to the intestines (Record, Vol. VII at 2458). Dr. Michael S. Lowe, M.D.'s discharge report further clarifies the issue by stating "the patient was found to have an internal hernia from an adhesional band cutting off the vascular supply to nearly the entire small bowel, cutting across the mesentary (Record, Vol. I at 00008-00009). Dr. Lowe refers to the band made out of scar tissue in a different part of the abdomen than the stomach. Plaintiff argues this was not a "rebanding surgery" as proffered by Fortis in its original brief. Plaintiff contends Fortis redefined the use of the word band to imply Plaintiff had a re-banding of his stomach and denied the claim, when in fact, Dr. Ken Beckman related the adhesional band(s) on the Plaintiff's intestines to Plaintiff's "gastric bypass." Plaintiff argues stomach banding is not the same procedure as gastric bypass, and "Fortis's medical directors inability to distinguish stomach banding surgery from a gastric bypass is incomprehensible, and to somehow relate an intestinal adhesion to a different organ entirely (the stomach) is completely suspect, and self-serving." (Plaintiff's Reply at 5).

In an effort to finally diagnose Plaintiff's continuing medical difficulties, Dr. Traub ordered a Hidascan to be initiated. This procedure conclusively verified multiple stones, wall thickening and the source of the Plaintiff's on-going physical complaints (Record, Vol. VII at 2460). On December 11, 2001, the Plaintiff's gall bladder was surgically removed at St. Anthony Hospital in Oklahoma City, Oklahoma, and his stomach re-banded for precautionary measures. The Plaintiff's need for IV hydration, in addition to his on-going medical problems, ceased at that time. Therefore, Dr. Traub's initial diagnosis that Plaintiff's medical difficulties were related to his prior stomach banding surgery was incorrect. Dr. Traub's suspicions were objectively substantiated by the Hidascan report and the pathology report of the gall bladder, which showed both acute and chronic inflamation.

Fortis's Dr. Scott Brumblay opined that 25% of the services the Plaintiff received should be paid as a secondary surgery not related to excluded services. He stated:

> the record shows that gastric outlet obstruction was the

>       primary and chronic problem and that cholecystectomy
>       was incidental to the surgery intended to treat the
>       obstruction.

Plaintiff contends asserting that somebody only has a partially inflamed gall bladder accounting for only partial symptoms is not medically accurate. Additionally, Dr. Brumblay's statement that the medical records indicate Plaintiff's primary and chronic medical complaint was gastric outlet obstruction is not supported by the evidence, records, or diagnostic tests performed by various medical specialists. The scopes performed by Dr. Siefert and Dr. Aran both indicated there was no obstruction (Record, Vol. VII at 2454, 2456). A subsequent barium swallow also verified no gastric outlet obstruction (Record, Vol. VII at 2455). Plaintiff argues Dr. Brumblay's opinion is clearly in error, or he failed to read and review Plaintiff's medical records in their entirety. The Hidascan, as ordered by Dr. Traub, was markedly positive and should have proved to Fortis the primary surgery that needed to be performed was the removal of Plaintiff's diseased gall bladder.

Finally, Fortis's Dr. Charlotte Heidenreich states: "Outlet stomal stenosis is a relatively common complication of gastric bypass and VGB; prolonged outlet obstruction can result in GERD and esophagitis." The record documents the Plaintiff's GERD symptoms date back to 1999, some ten (10) months prior to his surgery. Three separate diagnostic tests (two endoscopies and barium swallow study) clearly indicate the Plaintiff did not have either outlet stomal stensosis, or the gastric outlet obstruction that Dr. Heidenreich maintains.

Fortis has denied virtually all medical care the Plaintiff received post surgery, except partial payment for Plaintiff's gall bladder removal surgery, which Fortis refers to as a secondary surgery. The court finds Fortis's medical directors failed to either review, or give credibility, to the objective medical test results submitted to them, i.e., endoscopies, barium swallow, Hidascan, and Dr. Traub's exhaustive medical charts, notes, letters and appeals. Instead, they related all of the Plaintiff's medical complaints to the stomach banding surgery. Further, although Fortis claims a thorough review of the denials was initiated at all appellate levels by their medical directors, it is noteworthy that the administrative record supplied by Fortis failed to include the extremely important diagnostic studies submitted on the Plaintiff's behalf in Volume VII of the administrative record, as well as the narrative review/reports of its own medical directors. Finally, while the "treating physician rule" which was developed in the context of social security cases does not apply in ERISA cases, it is also true that plan fiduciaries "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician." *Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).*

Accordingly, the court finds Fortis's decision denying Plaintiff's claims is unsupported by the evidence contained in the administrative record and was therefore arbitrary and capricious. "A remand for further action is unnecessary if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir. 1996) citing, Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993).*

**IT IS SO ORDERED** this 8th of November, 2005.

James H. Payne
United States District Judge
Northern District of Oklahoma